UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **BRITTANY FINNEY,**<br>  Plaintiff,<br><br>v.<br><br>**METROPOLITAN LIFE<br>INSURANCE COMPANY,**<br>  Defendant. | **Case No. 1:22-cv-1046-CLM** |

## MEMORANDUM OPINION

Selena Anderson worked for the Social Security Administration when she fell and broke her leg and ankle while exiting a vehicle. Anderson suffered a pulmonary thromboembolism and died six days later.

The Federal Employees' Group Life Insurance Act of 1954 ("FEGLIA"), 5 U.S.C. § 8701 *et seq.*, establishes a life insurance program for federal employees. Through FEGLIA, Anderson had both life insurance and accidental death insurance. Anderson's daughter Brittany Finney submitted a claim to Metropolitan Life Insurance Company ("MetLife") for both benefits. MetLife paid Finney's claim for FEGLI life insurance benefits but denied her claim for accidental death benefits.

Finney challenges MetLife's denial of accidental death benefits here. She alleges that MetLife breached an insurance contract (Count I) and denied her claim in bad faith (Count II). (Doc. 1). Both parties move for judgment on the administrative record. (Docs. 11, 15). For the reasons stated within, the court **WILL GRANT** MetLife's motion for judgment (doc. 15) and **WILL DENY** Finney's motion for judgment (doc. 11). The court will thus **dismiss with prejudice** Finney's complaint (doc. 1).

## BACKGROUND

As explained below, this case turns on whether Anderson's death was a "direct result" of her fall, independent of "all other causes," including a preexisting "physical or mental illness." The court starts by explaining where this language comes from, then explains how Anderson's pre-fall health condition factored into MetLife's decision.

### A.   FEGLIA

FEGLIA entitles federal employees to be insured for group life insurance, 5 U.S.C. § 8704(a), and group accidental death and dismemberment insurance, 5 U.S.C. § 8704(b). The Office of Personnel Management "may prescribe the time at which and the conditions under which an employee is eligible for coverage under" FEGLIA. *See* 5 U.S.C. § 8716(a) and (b). Relevant here, OPM defines accidental death and dismemberment to mean "the insured's death . . . that results directly from, and occurs within one year of, a bodily injury caused solely through violent, external, and accidental means." 5 C.F.R. § 870.101.

OPM's FEGLI handbook elaborates on when accidental death and dismemberment benefits are generally payable:

### ACCIDENTAL DEATH AND DISMEMBERMENT (AD&D) BENEFITS

#### When Are Benefits Payable?

Accidental death and dismemberment (AD&D) benefits are payable when you sustain bodily injury solely through violent, external, and accidental means, and as a direct result of the bodily injury, independently of all other causes, and within one year afterwards, you lose your life, limb (hand or foot), or eyesight.

- Loss of hand means loss by severance at or above the wrist joint, or equivalent loss, as determined by OFEGLI.
- Loss of foot means loss by severance at or above the ankle joint, or equivalent loss, as determined by OFEGLI.
- Loss of eyesight means total and permanent absence of any usable vision in one eye.

Accidental death benefits, if payable, are payable *in addition to* "regular" FEGLI benefits.

(Doc. 13-2, p. 60).

But several exclusions apply to claims for FEGLI accidental death and dismemberment benefits:

> **Exclusions**
>
> AD&D benefits will not be paid if your death or loss in any way results from, is caused by, or is contributed to by:
>
> - **physical or mental illness;**
> - the diagnosis of or treatment of a physical or mental illness;
> - ptomaine or bacterial infection. However, accidental death and dismemberment benefits will be paid if the loss is caused by an accidentally sustained external wound;
> - a war (declared or undeclared), any act of war, or any armed aggression against the United States, in which nuclear weapons are actually being used;
> - a war (declared or undeclared), any act of war, or any armed aggression or insurrection in which you are in actual combat at the time bodily injury is sustained;
> - suicide or attempted suicide;
> - injuring yourself on purpose;
> - illegal or illegally obtained drugs that you administer to yourself; or
> - driving a vehicle while intoxicated, as defined by the laws of the jurisdiction in which you were operating the vehicle.

(*Id.*; *see also* doc. 16-9, p. 29). Relevant here is the circled exclusion for a "death or loss" that "in any way results from, is caused by, or is contributed to by physical or mental illness."

Under the FEGLI contract, MetLife's determination that a claim for accidental death benefits isn't payable because the death doesn't fall within the definition of accidental death or does fall within an exclusion "is to be given full force and effect, unless it can be shown that the determination was arbitrary and capricious." (Doc. 16-9, p. 27).

### B. Anderson's Death

On June 24, 2021, Anderson fell in a parking lot while exiting a motor vehicle and suffered multiple fractures to her right leg below the knee. (Doc. 13-1, pp. 30–31). Anderson was promptly taken to Marshall Medical Center in Boaz, which discharged Anderson to return home to Birmingham for orthopedic consultation and likely surgery. (*Id.*, p. 31). Six days later, Anderson died. (*Id.*, 29–30).

According to Anderson's death certificate, the cause of her death was pulmonary thromboembolism caused by the multiple fractures she suffered in the motor vehicle accident. (*Id.*). Anderson's original death certificate listed her manner of death as a result of "natural causes," but a supplemental death certificate issued around four months after Anderson's death changed the manner of death to "accident." (*Id.*). Anderson's autopsy report noted that Anderson "had complex medical problems including heart failure" and described her as "a 59-year-old woman with a past medical history of interstitial lung disease on steroids and home oxygen, COPD, chronic smoker, heart failure," and other preexisting conditions. (*Id.*, p. 70). The autopsy report found that Anderson's "cause of death was pulmonary embolism in a patient with underlying interstitial lung disease. The right lower extremity fractures were likely responsible for the final event." (*Id.*, pp. 70–71).

### C. Finney's Claim for Benefits

Anderson had around $57,000 in FEGLI accidental death and dismemberment coverage when she died. MetLife, which has a contract with the United States Office of Personnel Management, administers claims for FEGLI benefits through its Office of Federal Employees Group Life Insurance ("OFEGLI") in accordance with the requirements of FEGLIA and the FEGLI contract.

After her mother's death, Finney submitted a claim to MetLife for FEGLI accidental death proceeds her mother had enrolled in before she died. (*Id.*, pp. 2–10). During a December 29, 2021 call, a MetLife claims consultant advised Finney that Anderson's medical history possibly contributed to her passing and that her case would be "reviewed with our medical dept to confirm there was no contributors as exclusions state that the accident must be solely through accident with no contributing factors." (Doc. 13-2, p. 6).

MetLife then had Dr. Neil K. Gupta review Anderson's medical records and provide a Peer Review Report. (Doc. 16-3, pp. 45–47). In Dr. Gupta's opinion, Anderson's death was not a direct result of an injury, independent of other causes. (*Id.*, p. 45). In support of this opinion, Dr. Gupta stated that "[t]he documentation indicates that the claimant was noted to have pulmonary thromboembolism involving the main pulmonary artery and

4

proximal and left arteries." (*Id.*, pp. 45–46). He then said that "[t]here were various contributors that led to the decedent's death related to the pulmonary embolism, including her known history of interstitial lung disease, on home oxygen, as well as COPD" and that Anderson "had poor reserve, which likely increased the severity of her pulmonary embolism." (*Id.*, p. 46).

Dr. Gupta also found that Anderson's death "was contributed to by physical illness." (*Id.*). Dr. Gupta supported this opinion with his earlier reasoning that "there were various contributors that led to the decedent's death related to the pulmonary embolism, including her known history of interstitial lung disease, on home oxygen, as well as COPD" (*Id.*). Dr. Gupta then emphasized that Anderson had poor reserve, was on oxygen at home, and "likely had decreased ability to clear her pneumonia in the context of her known COPD and ILD." (*Id.*).

### D. MetLife's Denial of Finney's Claim

On January 7, 2022, MetLife wrote Finney to inform her that it was denying her claim for accidental death benefits. (Doc. 13-1, pp. 149–50). Consistent with Dr. Gupta's report, MetLife stated that Anderson's autopsy report "indicates there were various contributors that led to the decedent's death related to pulmonary embolism, including her known history of interstitial lung disease, on home oxygen, as well as COPD." (*Id.*, p. 149). MetLife also noted that Anderson "had poor reserve, which likely increased the severity of her pulmonary embolism." (*Id.*). MetLife then stated that to receive accidental death benefits the "insured's death must have been caused solely by violent, external and accidental means, and that an insured must have died as a direct result of such bodily injuries independently of all other causes." (*Id.*, p. 150). Finally, MetLife explained it could not "pay accidental means death benefits because the cause of death was contributed to the insured's medical history which is excluded due to her physical illness." (*Id.*).

Finney obtained counsel, appealed MetLife's denial of benefits, and requested more time to submit information in support of her appeal. (*Id.*, pp. 139–40).[1] In support of her claim for benefits, Finney provided MetLife with a

---

[1] MetLife denies that it allowed Finney to appeal, asserting that FEGLIA does not provide for an appeal of claim determinations. But MetLife admits that it allowed Finney to submit

peer review report from forensic pathologist Dr. James R. Lauridson, M.D. (*Id.*, pp. 158–65). Dr. Lauridson's report stated:

> March 28, 2022
>
> I have been asked by Clay Williams Esq., to review the death of Selina Anderson who was injured on June 24, 2021 and died on June 30, 2021 after surgical and medical therapies initiated to repair the initial injury.
>
> The medical legal certification of death properly attributes the cause of death as the event that initiates any subsequent events, usually therapeutic. This is called the proximate cause of death.
>
> In some cases, the events following the initial event may culminate in death. Even if this is the outcome, the initial event is legally the cause of death (also known as the proximate cause of death).
>
> In the case of Selina Anderson the proximate cause of death was the accident causing the fractures of her leg. The treatment of the fractures let to a series of medical complications that resulted in her death. The autopsy report from UAB Medicine lists a pulmonary thromboembolism as the cause of death. This was a complication that occurred during treatment for the fractures.
>
> I am a board certified forensic pathologist and medical examiner with 30 years of experience in medical legal death certification. My resume in included.
>
> James R. Lauridson, M.D.

(*Id.*, p. 158).

MetLife again denied Finney's claim for benefits based on two "independent and separate reason[s]." (Doc. 13-2, pp. 21–23). First, MetLife found that it was "unable to pay FEGLI accidental death benefits because the record does not support that the decedent sustained bodily injuries solely through violent, external and accidental means, and died as a direct result of such bodily injuries independently of all other causes, as would be required for such benefits to be payable." (*Id.*). Second, MetLife found that "the record supports that here, FEGLI accidental death benefits are not payable because at minimum, physical illness contributed to the death, and such benefits are not payable if in any way the death or loss resulted from, was caused by, or was contributed to by physical illness." (*Id.*).

---

new information in support of her claim and that it reviewed this information after receiving it.

## STANDARD OF REVIEW

The parties agree that the court should apply the standard of review that the Eleventh Circuit uses in ERISA cases to Finney's claims. *See* (Doc. 12, pp. 16–18) (citing ERISA cases); (Doc. 18, pp. 7–8) (same).

Under this standard, six steps guide the court's review of the denial of a claim for benefits. *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). Those steps tell the court to:

1. Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the judicial inquiry and reverse the decision.

3. If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether reasonable grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355.

#### DISCUSSION

As explained, MetLife denied Finney's claim for accidental death benefits for two reasons. First, MetLife found that Anderson's death didn't meet the definition of accidental death as defined in the OPM regulations, OPM handbook, and FEGLI contract because Anderson's death did not result directly from an accidental bodily injury. Second, MetLife found that Finney's claim fell within the physical illness exclusion to accidental death benefits.

The court finds that MetLife had at least reasonable grounds to deny Finney's claim under the physical illness exclusion. So the court needn't decide whether MetLife also had reasonable grounds to determine that Anderson's death didn't meet the definition of an accidental death.

I.   **How to interpret the FEGLI contract?**

The Benefits Payable section of the accidental death policy requires that the death be "a direct result of the bodily injury, independent of all other causes[.]" (Doc. 13-2, p. 60) (highlight added). Later, the Exclusion section excludes accidental death benefits coverage "if the death or loss in any way results from, is caused by, or is contributed to by . . . the insured having physical or mental illness." (Doc. 16-9, p. 29) (highlight added).

a. *Exclusion's plain language*: Combined, these highlighted provisions exclude coverage if a preexisting physical condition played any part in Anderson's death.

Starting with the exclusion provision, a condition 'contributes to' an event if the condition has a part in making the event happen. *See Contribute*, Oxford English Dictionary Online, https://www.oed.com/dictionary/ contribute (last visited Sep. 10, 2024) ("5.b. More usually *intransitive*. **to contribute to** . . .: to do a part in bringing (it) about; to have a part or share in producing."); *Contribute*, Merriam-Webster Dictionary Online, https:// www.merriam-webster.com /dictionary/ contribute (last visited Sep. 10, 2024) ("3 *intransitive*: to play a significant part in making something happen"). And the exclusion's use of the phrase "in any way" to modify "is contributed to by" shows that the exclusion is intended to apply when a physical illness played *any* part in the death or loss.

The Benefits Payable section's use of the phrase "a direct result of bodily injury, independent of all other causes" bolsters the court's interpretation of the exclusion provision. "Independent of all other causes" can be read only to mean that a preexisting condition cannot cause the death in any way. Or, put another way, the preexisting condition can play no part.

For these reasons, the court finds that the physical illness exclusion applies if a physical illness played any part in producing Anderson's death.

b. *Caselaw*: Finney says this plain interpretation of the physical illness exclusion contradicts Eleventh and Fifth Circuit caselaw. According to Finney, the cases below provide that she is entitled to accidental death benefits if Anderson's fractured leg was the proximate cause of her death, and MetLife cannot show that Anderson's preexisting physical conditions substantially contributed to—rather than played any part in—her death.

o *Dixon:* Finney first cites *Dixon v. Life Ins. Co. Of N. Am.*, 389 F.3d 1179, 1180 (11th Cir. 2004), an ERISA accidental death benefits case in which Mr. Dixon's group policy covered accidents "which, directly and from no other causes, result in a covered loss." After Mr. Dixon died in a single car accident, his widow claimed accidental death benefits under the policy. *See id.* Life Insurance Company of North America ("LINA") denied Mrs. Dixon's claim, finding that Mr. Dixon died of a heart attack and that heart disease at least contributed to his death. *See id.* at 1181–82.

In reviewing the district court's grant of summary judgment to LINA, the Eleventh Circuit adopted as part of the "federal common law" of ERISA the rule that in ERISA cases "a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss." *Id.* at 1184. The circuit court reasoned that interpreting the "directly and from no other causes" language in Mr. Dixon's policy this way advanced "ERISA's purpose to promote the interests of employees and their beneficiaries." *Id.* So the court said that it would not consider Mr. Dixon's "pre-existing heart disease as a cause unless it substantially contributed to his death." *Id.* Even so, the circuit court affirmed the district court's grant of summary judgment to LINA, finding that Mr. Dixon's "heart failure was directly due to his atherosclerotic and hypertensive heart disease." *Id.* at

9

1184–85. Thus, "Mr. Dixon's pre-existing heart condition 'substantially contributed' to his death, regardless of whether the auto accident was the immediate cause in that it triggered his heart attack." *Id.*

o *Bradshaw:* Thirteen years later, in *Bradshaw v. Reliance Standard Life Insurance Company*, 707 F. App'x 599 (11th Cir. 2017), the Eleventh Circuit applied *Dixon* to an ERISA policy's preexisting condition exclusion that's like the physical illness exclusion in the FEGLI contract. Plaintiff Bradshaw "had a healthy pregnancy and no other pre-existing medical conditions when she bought a disability-insurance policy" from Defendant Reliance. *Id.* at 600. At 38 weeks pregnant, Bradshaw was diagnosed with mild preeclampsia and gave birth to a healthy baby girl. *Id.* at 601. A week after giving birth, Bradshaw suffered a debilitating stroke that left her totally disabled. *Id.* at 601–602. So Bradshaw filed a claim with Reliance for long-term disability. *Id.*

Reliance denied Bradshaw's claim for benefits under its policy's preexisting condition exclusion, finding that her pregnancy was a preexisting condition that precluded coverage. *Id.* at 602. That exclusion provided that Reliance would not pay benefits for a total disability (1) caused by, (2) contributed to by, or (3) resulting from a preexisting condition. *Id.* And the policy defined preexisting condition as a sickness or injury the insured received medical treatment for "during the three (3) months immediately prior to the Insured's effective date of insurance." *Id.*

Applying *Dixon*, the circuit court interpreted the preexisting condition exclusion as excluding coverage "for only those losses *substantially* caused by, *substantially* contributed to by, or *substantially* resulting from a pre-existing condition." *Id.* at 608. The court reasoned that "[t]his interpretation of the Policy language not only comports with our precedent but it also advances ERISA's clear purpose to provide greater coverage to beneficiaries." *Id.* And the court held that it was unreasonable for Reliance to find that Bradshaw's pregnancy, the only condition she had during the relevant look-back period, substantially contributed to her total disability. *See id.* at 609–10. In reaching this result, the court reasoned that Bradshaw did not suffer from high blood pressure, preeclampsia, or symptoms of a stroke during the look-

10

back period and that stroke is not a condition normally associated with a healthy pregnancy. *Id.* at 609.

- o *Wells:* In *Wells v. Minnesota Life Insurance Company*, 885 F.3d 885, 887 (5th Cir. 2018), Plaintiff Wells was the widow of Melton Dean Wells who died after being bitten by a mosquito carrying the West Nile Virus. After Minnesota Life Insurance Company denied Mrs. Wells accidental death benefits, she sued Minnesota Life for breach of contract under Texas state law. *Id.* at 888–89. The Fifth Circuit reversed the district court's grant of summary judgment on Mrs. Wells' breach of contract claim finding genuine disputes of material fact over (a) whether the policy's insuring clause covered Mrs. Wells' claim for accidental death benefits, and (b) whether Mr. Wells' preexisting conditions of obesity, diabetes, and hypertension excluded coverage under a policy exclusion. *See id.* at 895–96.

Relevant to the physical illness exclusion, is the Fifth Circuit's holding that the Minnesota Life policy's exclusion for death that "is caused directly or indirectly by, results from, or there is contribution from . . . bodily or mental infirmity, illness, or disease . . ." applies "only to conditions existing when the accident happened." *Id.* at 895. The circuit court then found that there was a genuine dispute of material fact about whether Mrs. Wells' claim for benefits fell within this exclusion because her expert had testified that neither Mr. Wells' obesity, age, diabetes, nor hypertension "was a contributing factor to his demise." *See id.*

—

If these cases controlled, the court would agree with Finney that her mother's preexisting health conditions must have substantially contributed to her death, rather than played any part in her death. But two of these cases applied federal common law to ERISA, and the other applied Texas state law. None looked at FEGLIA, the controlling statute here.

c. *FEGLIA*: Congress provided that a FEGLI contract's provisions "supersede and preempt any law of any State or political subdivision thereof . . . to the extent that the law . . . is inconsistent with the contractual provisions." 5 U.S.C. § 8709(d)(1). So the court must apply a FEGLIA

contract's plain terms, even if doing so contradicts federal common law on ERISA or applicable state law.

FEGLIA states that eligibility for payment of accidental death benefits is "[s]ubject to the conditions and limitations approved by the Office of Personal Management which are contained in the policy purchased by the Office." 5 U.S.C. § 8704(b). So in breach of contract cases based on the denial of FEGLI benefits, courts have interpreted unambiguous provisions in the FEGLI contract according to their plain meaning. *See, e.g.*, *Belcher v. Metro. Life Ins. Co.*, 943 F.2d 251 (6th Cir. 1991) (applying plain language interpretation to phrase "accidental means" and noting that "this reading of the policy is not affected by the possibility that similar language might be construed differently under state law"). Because FEGLIA specifically conditions the payment of accidental death benefits on satisfying the conditions and limitations in the FEGLI contract, and the payable benefits and exclusion provisions are unambiguous, the court finds that the 'substantially contributed to' test doesn't apply to Anderson's accidental death benefits. Instead, the plain language of the contract says that benefits are not payable if a physical illness had a part in causing Anderson's death.

## II. Did reasonable grounds support MetLife's determination?

Under the FEGLI contract, MetLife is vested with discretion in reviewing claims for benefits. *See* (Doc. 16-9, p. 27) ("The Contractor's determination as to the entitlement to payment of Benefits is to be given full force and effect, unless it can be shown that the determination was arbitrary and capricious.")). So the court can reverse MetLife's claims determination only if MetLife's decision to deny Finney's claim for accidental death benefits was arbitrary and capricious. *See Blankenship*, 644 F.3d at 1355. "In applying the arbitrary and capricious standard, this Court's role is limited to determining whether [MetLife's] interpretation was made rationally and in good faith-not whether it was right." *Guy v. Se. Iron Worker's Welfare Fund*, 877 F.2d 37, 38 (11th Cir. 1989) (quotations omitted). Thus, MetLife's determination "need not be the best possible decision only one with a rational justification." *Griffis v. Delta Fam.-Care Disability*, 723 F.2d 822, 825 (11th Cir. 1984).

a. *Plain language interpretation*: Applying the physical illness exclusion's plain language, the court finds that MetLife had reasonable grounds to deny Finney's claim for accidental death benefits. Anderson's death certificate explained that she suffered a pulmonary embolism after suffering fractures from a motor vehicle accident. But Anderson's death certificate is silent about whether any underlying health conditions made her susceptible to pulmonary embolisms or increased the severity of the embolism. The autopsy report, however, connects the pulmonary embolism to Anderson's past medical history of interstitial lung disease by saying "cause of death was pulmonary embolism in a patient with underlying interstitial lung disease." (Doc. 13-1, pp. 70–71). The autopsy report also describes Anderson's "right lower extremity fractures" as "responsible for the **final** event" that led to her pulmonary embolism, which suggests that other factors also played a part in the embolism. (*Id.* (emphasis added)). And it was Dr. Gupta's opinion that "various contributors" led to Anderson's death, including "her known history of interstitial lung disease, on home oxygen, as well as COPD." (Doc. 16-3, p. 46). To support this opinion, Dr. Gupta said that Anderson "had poor reserve, which likely increased the severity of her pulmonary embolism" and that Anderson "likely had decreased ability to clear her pneumonia in the context of her known COPD and ILD." (*Id.*).

Dr. Lauridson's opinion says that the proximate cause of Anderson's death "was the accident causing the fractures of her legs" and that the pulmonary thromboembolism was "a complication that occurred during treatment for the fractures." (Doc. 13-1, p. 158). But Dr. Lauridson's opinion does not address the effect Anderson's preexisting conditions had on her pulmonary embolism. As the other record evidence suggests that Anderson's health conditions did play a part in her death, the court finds that MetLife reasonably found that accidental death benefits weren't payable because physical illness contributed to Anderson's death.

b. *Substantially contributed test*: The court would also find that MetLife's claims determination was reasonable even if the 'substantially contributed to' test applied to Finney's claim for benefits under the FEGLI contract. *See Dixon*, 389 F.3d at 1184–85 (applying substantially contributed to test and affirming denial of claim for benefits even though insurance company didn't apply test in reviewing claim for accidental death benefits).

13

Again, Dr. Gupta found that Anderson's interstitial lung disease and COPD contributed to her death. (*See* Doc. 16-3, p. 46). According to Dr. Gupta, Anderson (a) had poor reserve, which likely increased the severity of her pulmonary embolism, and (b) likely had decreased ability to clear her pneumonia because of her COPD and interstitial lung disease. (*Id.*). Dr. Lauridson's opinion doesn't contradict these findings or state the degree to which Anderson's preexisting conditions contributed to her death. Instead, he merely identifies the accident that caused Anderson's fractures as "the proximate cause of death" and the pulmonary embolism as a complication from treatment for the fractures. (Doc. 13-1, p. 158).

More importantly, the autopsy report described Anderson's cause of death as "pulmonary embolism in a patient with underlying interstitial lung disease. The right lower extremity fractures were likely responsible for the final event." (*Id.*, pp. 70–71). Based on this description of Anderson's death, it is reasonable to determine that while Anderson's injuries from her accident were the immediate cause of the pulmonary embolism, Anderson's underlying interstitial lung disease substantially contributed to her death. *See Dixon*, 389 F.3d at 1184–85 ("Mr. Dixon's pre-existing heart condition 'substantially contributed' to his death, regardless of whether the auto accident was the immediate cause in that it triggered his heart attack."). So the court finds that MetLife had reasonable grounds to deny Finney's claim for benefits.

—

In sum, the court finds that under either the plain language of the FEGLI contract or the 'substantially contributed to' test, MetLife had reasonable grounds to determine that the physical illness exclusion applied to Finney's claim for accidental death benefits. And Finney hasn't shown that any conflict of interest that MetLife may have affected its decision to deny her claim for benefits. So the court will grant MetLife's motion for judgment and will deny Finney's motion.

## CONCLUSION

For these reasons, the court **WILL GRANT** MetLife's motion for judgment (doc. 15) and **WILL DENY** Finney's motion for judgment (doc. 11). The court will enter a separate order that **dismisses with prejudice** Finney's complaint (doc. 1) and closes this case.

**Done** on September 10, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE